**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3009-23

WILLIAM J. SANTO, as
Administrator and Administrator
ad Prosequendum of the Estate
of MARGARET E. SANTO,

      Plaintiff-Respondent,

v.

MEADOWVIEW NURSING
AND REHABILITATION
CENTER, an unincorporated
business entity, and ATLANTIC
COUNTY, a governmental
entity,

      Defendants-Appellants,

and

MICHELLE SAVAGE, an
individual,[1]

      Defendant.

_____

Argued April 28, 2026 – Decided July 28, 2026

---

[1] Improperly pled as Michele Savage.

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0019-20.

Timothy B. Crammer argued the cause for appellants (Dughi Hewit & Domalewski PC, attorneys; Timothy B. Crammer, of counsel and on the brief).

Steven L. Procaccini (Procaccini Law Group LLC) argued the cause for respondent.

PER CURIAM

Defendant Meadowview Nursing and Rehabilitation Center (Meadowview), a nursing home owned and operated by defendant Atlantic County, appeals from a March 26, 2024 judgment in the amount of $450,000 and a May 10, 2024 order denying judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial. See R. 4:40-2; R. 4:49-1. The judgment was entered following a jury trial arising from an incident in which a resident suffered hypothermia while in Meadowview's care. The resident, Margaret Santo, was hospitalized after the incident and ultimately died two weeks later. Her son and executor of her estate, plaintiff William Santo, brought suit alleging violations of the New Jersey Nursing Home Residents' Rights Act (NHA or Act), N.J.S.A. 30:13-1 to -19.

2

The proofs adduced at trial showed that a Meadowview nurse called emergency medical services because Margaret's[2] temperature was low, she was cool to the touch, and she was excessively lethargic. When the emergency medical technicians (EMTs or EMS) arrived, one EMT remarked the room was cold. Margaret was subsequently transported to the hospital where the same EMT informed hospital personnel that the room was an "icebox." At trial, the parties strenuously disputed whether the room was cold with both fact and expert witness testimony. Although other violations of the Act were advanced, including a failure to notify a physician after withholding one of Margaret's medications for three days, the nurses' reliance on uncalibrated personal thermometers, and a failure to promptly intervene upon discovering Margaret's condition, the primary claim stems from the cold room.

On appeal, defendants argue there was insufficient evidence the room was cold, insufficient evidence defendants allowed the room to become cold, and insufficient evidence the standard of care was breached. Defendants also argue the judge erroneously admitted the EMT's testimony under N.J.R.E. 701 and both the verdict and the $450,000 damage award were against the weight of the

---

[2] We refer to some parties by their first names to minimize confusion. We intend no disrespect.

A-3009-23

evidence. Having considered the record and applicable law, we reject defendants' arguments and affirm.

I.

On February 19, 2018, Margaret was found in her bed at Meadowview, unresponsive, and with a body temperature indicative of hypothermia. Margaret was rushed to the hospital, where she was stabilized, transferred to a second long-term care facility, and then placed on hospice care for end-stage dementia. Margaret ultimately died on March 12, 2018. William brought suit on January 2, 2020, against defendants Meadowview and Atlantic County, alleging violations of the Act,[3] specifically N.J.S.A. 30:13-5(j) and (m).[4]

We glean the following facts from the six-day jury trial conducted between March 19 and March 26, 2024. Five witnesses testified for plaintiff, including William, the responding EMT, the attending emergency room

---

[3] Additionally, William's complaint sought recovery under the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, and alleged medical negligence. Meadowview's administrator, Michelle Savage, was also a named defendant. Prior to trial, plaintiff withdrew the Wrongful Death Act claims, the medical negligence claims, and all claims against Savage.

[4] N.J.S.A. 30:13-5(m) affords residents the right to "[n]ot be deprived of any constitutional, civil or legal right solely by reason of admission to a nursing home." N.J.S.A. 30:13-5(j) expressly enumerates the right to "a safe and decent living environment."

A-3009-23

physician, an expert in geriatric medicine, and an expert in nursing and nursing home administration. Eight witnesses testified for defendant, including five nursing professionals who treated Margaret, the division director of Atlantic County's Facilities Management, an expert in internal and nursing home medicine, and Meadowview's nursing home administrator in charge during the incident.

Meadowview is a "180-bed facility" that provides "hospice care," "respite care," "short-term stay, physical therapy, occupational therapy, speech therapy, . . . IV therapy, [and] memory care" for elderly individuals. Margaret became a resident at Meadowview sometime in 2013, the same year she was diagnosed with Alzheimer's dementia. Margaret also suffered from "[s]chizophrenia, anxiety, depression, hypothyroidism, and . . . hypertension." Margaret's records from Meadowview indicated she "[didn't] like horror movies, . . . like[d] comedies[,] and . . . enjoy[ed] the musical stylings of Lawrence Welk."

At some point during her stay, Margaret was transferred from a third-floor room to a ground level "garden floor" room with a roommate. William asserted the transfer was the result of his mother's tendency to "loud[ly] . . . sing[]." Margaret had a thermostat in her garden floor room, but it was only used to set the temperature and "ha[d] nothing to display the temperature in the room."

A-3009-23

William visited Margaret at Meadowview every few weeks. When he visited, Margaret would "touch [his] face," call him "Billy," ask him questions about family, "show . . . emotion," and "grab[ him]" when he "g[ave] her a kiss on the forehead and hug[ged] her." William did not recall Margaret ever complaining about the temperature in her room. On cross-examination, William acknowledged Margaret was transferred to a "mush diet," but attributed it to Meadowview not wanting "to deal with her teeth." He disputed that the change was because Margaret "deteriorated to a point where she was unable to feed herself."

William discovered Margaret was hospitalized when his sister called to tell him his mother "had become sick." When he later visited Margaret at the hospital, she was "not responding to [any]thing." William was "surprised to see [Margaret] that way," characterizing her as a "catatonic vegetable" and noting she did not respond to him speaking to her or holding her hand.

Dennis Ryan Damore, an EMT for TriCare Medical Transportation (TriCare), responded to the emergency call for Margaret. Part of Damore's job duties was to document and "pay attention to everything." However, he was not permitted to take a patient's temperature. Damore recalled that on February 19, 2018, he was "called for a sick person that was reported hypothermic and

6

disoriented for days." Damore's notes described that upon arrival, Margaret "had pinpoint pupils and was very cold to the touch." He was informed by staff that Margaret had been "nonverbal" "for [the] past few days," which, "per staff," "[wa]sn't [the] norm."

Upon entering Margaret's room, Damore noticed "a difference in temperature from the hallway." Damore "always wore a hoodie and a jacket [while he was working] at TriCare," and explained that being able to detect cold inside a room "should say a lot." Damore recalled wondering what the cause of the coldness was, and testified he "probably . . . looked at . . . where the window and the air condition[ing] unit" were located to see if anything was amiss. When asked to specify what he believed the temperature in the room was, Damore stated the room felt below seventy degrees Fahrenheit, but could not state with certainty it felt below sixty degrees Fahrenheit.

Damore recalled notifying the nurse at Shore Medical Center (Shore Medical), the hospital where Margaret was transported, that the room was an "icebox." Damore did not report the room being cold to TriCare and his supervisors, nor did he refer to the temperature of the room in his notes, because "[he] doubt[ed] anything [was] going to change." However, he notified Shore Medical about the room temperature because he believed "if [he] report[ed] that

A-3009-23

[finding] to the . . . hospital, they may be able to get something done" and it would help inform the hospital how to treat Margaret.

Damore did not recall if there was another resident in Margaret's room and did not record the temperature of the room. He also did not recall if he changed the thermostat or closed a window, but he testified he would have "intervene[d]" if a window was open or an air conditioner unit was blowing cold air.

Roberta May was the attending emergency physician at Shore Medical who treated Margaret. May's note recording Margaret's arrival, which was entered into Shore Medical's system around 2:19 p.m. and read into the record at trial, documented:

> The patient presents with hypothermia. The onset was unknown. The course/duration of symptoms is unknown. The location where the incident occurred was at a nursing home. Nature of circumstance of exposure was EMS stated patient's room was an "icebox." Associated symptoms, unknown. Degree of symptoms is moderate. Risk factors consist of non-verbal/immobile. Prior episodes are unknown. Therapy today is emergency medical services.

May clarified her note did not indicate a diagnosis of hypothermia but instead documented what the nursing home conveyed to Shore Medical about Margaret's condition. Further, the note indicated the term "icebox" was not May's word but instead conveyed what an EMT had told her. A later note

 A-3009-23

entered at 2:41 p.m. indicated Margaret's skin was "[w]arm and dry," her blood pressure was "low," and her rectal temperature was 89.9 degrees Fahrenheit, which, according to May, provided "a more accurate core temperature" than a tympanic reading. The note also indicated Margaret was "in no acute distress" and "[o]pen[ed] [her] eyes to her name."

At the hospital, Margaret was wrapped in blankets and a "bear-hugger," which is "an inflatable blanket with several tubes . . . that infuses warm air" on a patient to treat hypothermia. After some time, Margaret's temperature began to rise and stabilized. May explained hypothermia can be caused by "cold exposure," "sepsis," "poor regulatory processes," "medication[]," and "thyroid disorder[]." May testified it was not her role "to determine the cause of th[e] hypothermia," but noted Margaret had no indication of sepsis, besides the hypothermia.

Dr. Perry Starer testified[5] as plaintiff's expert in geriatric medicine. Starer opined that Meadowview breached its duty of care toward Margaret by "fail[ing] to provide her with one of the most basic services that one would expect from such a facility," resulting in "a drop in [Margaret's] body temperature, which set off a sequence of adverse effects." Specifically, Starer asserted Meadowview

---

[5] His de bene esse testimony was presented to the jury by video.

9

was required to protect Margaret from having

> swings in her temperature which might make the body either too hot or too cold. And the way that one does that is to know whether she's at risk of having a fluctuation in temperature and provide her with an environment where she can exist comfortably and not have a swing in temperature. . . . [T]his is a case where it was cold. It's February, it's New Jersey, it's the northeast, and it was a cold day. . . . [B]ased on what I read, [Meadowview] failed to do such a thing.

Starer explained that Meadowview "exposed [Margaret] to unsafe conditions[, namely] . . . a room which was perceived by others as being cold." While Starer acknowledged he was not personally familiar with the room temperature, he was able to conclude that "[t]he room was cold" based on his review of the records. According to Starer, "the coldness of the room [was] a breach of [Meadowview's] duty of care," and Margaret "was injured by those conditions" by becoming "encephalopathic" and "suffer[ing] changes in her clinical condition which stayed with her until the end of her life." Starer confirmed his opinion would not change if Margaret had a roommate who did not become hypothermic.

Starer ruled out Margaret's medication as a cause of her hypothermia. Although the medication Margaret was taking prior to the incident "would have impaired her ability to maintain her body temperature if she was . . . in an

10

environment that was cold," Starer believed "[i]n isolation, the medicine should not have lowered [Margaret's] body temperature." Starer concluded Margaret "would have needed exposure to [a] cold external temperature" to develop hypothermia.

Starer also noted nothing in the record indicated Shore Medical had any concerns with Margaret's medication's capacity to "interfer[e] with her ability to regulate her body temperature," nor were there any records indicating Margaret had felt "cold to the touch" prior to the incident. Further, Starer did not find records indicating Margaret's hypothermic episode was "going to be a recurring problem due to some innate failure of her body to be able to maintain a normal body temperature."

Starer testified Margaret "changed" after the hospital visit. Starer recounted prior to the incident, Margaret "could talk[6] to the activities director about whatever movie she wanted to watch" and "could recognize staff members." However, after the incident, Margaret became completely non-verbal.

Starer acknowledged Margaret's dementia was degenerative and "[would

---

[6] Margaret's "talking" appeared to be closer to "making sounds" rather than conventional speech.

A-3009-23

have] progressively worsen[ed] over time." Starer admitted as of December 2017, Margaret was "not oriented to the location of [her] room or even where she was," had "trouble with short term memory, [had] trouble with long term memory, and . . . lacked the ability to participate in her own decision-making" because of her dementia. Margaret had also "experienced a decrease in [her] activities of daily living with respect to bed mobility, transfer, eating, and toileting" over the two-year period prior to the incident. Notably, at some point in 2016, Margaret had been admitted to Shore Medical due to a choking incident, and Shore Medical had recommended she be switched to a "honey-thick liquid diet."

However, Starer rejected the notion that Margaret was suffering from end-stage dementia. According to Starer, end-stage dementia described a patient whose "disease process ha[d] deteriorated as far as it can," and who had "lost all function." Starer testified there was "[no] indication in 2017 that [Margaret] was suffering from end[-]stage dementia," and, if she was, an appropriate care plan would have been in place at Meadowview.

Elenore Tache, plaintiff's nursing and nursing home administration expert, also opined on Meadowview's duty. Tache believed Meadowview failed to "follow the proper procedures and protocols" by "fail[ing] to notify the

12

physician in a timely manner of what [Margaret's] status was on the morning in question" and by "expos[ing Margaret] to cold temperatures within her room at the facility."[7]

First, Tache noted Margaret's medical records indicated every other dose of Margaret's Klonopin had been withheld for four consecutive days up to the day of the incident. The records showed the nurses withheld the medication because Margaret was "lethargic." Although nurses are permitted to withhold a dose of medication based on clinical judgment, "after several instances of [medication] being [with]held in a row," a physician should be contacted.[8] According to Tache, the nurse's failure to notify a physician after three consecutive days of withholding Margaret's medication violated the standard of care.

---

[7]  Tache also testified that "fail[ing] to transfer [Margaret] to the emergency room in a timely manner" was a breach of Meadowview's duty. However, this latter opinion was based on her confusion regarding when Margaret's temperature was taken. Tache acknowledged that "[i]f the vital[] signs and so forth were taken at 1:15 and [Margaret] was sent out at 1:30, that [would be] acceptable." Evidence presented at trial indicated that this approximates what occurred.

[8] It would be the nurse's responsibility to contact the physician because the notes documenting withheld medication are typically reviewed only by the nurses.

A-3009-23

Second, Tache opined that Meadowview failed to "provide a safe and comfortable environment" for Margaret and failed to "set the room within a specific [temperature] range,"[9] which are "separate dut[ies]." Tache's opinion was based on the fact that Margaret was hypothermic, Damore had described the room as an "icebox," and Margaret was cold to the touch. Tache's opinion "factor[ed] in that there's no way of knowing what the temperature of the room that day actually was." Tache also noted that a facility should provide thermometers, and it would be "unusual" for a nurse to use his or her own thermometer, as it would need to have an "inspection check."

---

[9] A nursing home typically is required to keep the temperature of all areas within a specified range. Notably, there is a distinction between the temperature a nursing home participating in the Medicare and Medicaid programs is required to maintain, and New Jersey state standards. Compare N.J.S.A. 26:2H-14.4(a) ("All areas used by patients or residents shall be maintained within a temperature range from [sixty-five] to [eighty-one] degrees Fahrenheit, except in rooms . . . where residents can individually control the temperature in their own living units, independent from other areas.") with 42 CFR 483.10(i)(6) ("Facilities initially certified after October 1, 1990[,] must maintain a temperature range of [seventy-one] to [eighty-one] [degrees Fahrenheit]"). While there was some confusion regarding which standards were appropriate for Tache's opinion, Tache testified that even if a room's temperature was within regulations, it could still "create a risk of harm to the resident" "depending on the patient's medical conditions."

After plaintiff rested,[10] defendants called Takako Potts, a Meadowview nurse who treated Margaret for two years. Potts testified she first checked on Margaret on February 19, 2018, at around 9:00 a.m. Potts said the door to the room was open, the windows were closed, and the room was not cold. According to Potts, Margaret was not arousable, but her skin did not feel cool to the touch. Potts added Margaret's roommate was in the room with her. Because Margaret had difficulty arousing, Potts withheld Margaret's morning Klonopin dose and took her temperature using Potts's personal thermometer.

Potts stated she did not record the initial temperature in Margaret's records because it was "normal." "Normal" temperature was "above . . . [ninety-six degrees Fahrenheit]," "depending on the patient," and "depending on how you take [the temperature]." Potts returned to Margaret's room at around 1:15 p.m., and took her tympanic temperature, which read 95.6 degrees Fahrenheit. Margaret was still not arousable and her skin felt "[a] little cool to [the] touch," but the room still did not feel cold to Potts. After Potts took Margaret's temperature the second time, she contacted her supervisor who told her to "send

_____

[10] Prior to presenting their case, defendants moved for a directed verdict. See R. 4:40-1. After reciting the applicable law, the judge denied the motion, finding a jury could decide in plaintiff's favor based on the evidence presented.

A-3009-23

[Margaret] to the hospital." Potts called 9-1-1 and was present with Margaret when the EMTs arrived.

Potts told the EMT Margaret was having "poor intake, difficulty arousing, and [a] low temperature." The poor intake and difficulty arousing had "been going on . . . [for a]pproximately . . . two days," while the low body temperature started "[t]hat day." In response to her comment about Margaret's temperature, Potts recalled an EMT stating, "Oh, the room is cold." Potts then checked the thermostat in the room and discovered "it was at the right setting," "[seventy] degrees" Fahrenheit.

Potts testified Margaret's roommate never became hypothermic or complained of the cold, despite being in the room with Margaret that day. Maintenance was also never called as the room "wasn't cold." On cross-examination, Potts admitted that although Margaret was "not fully awake" at 9:00 a.m. and was having difficulty eating, Potts did not make a note of Margaret's condition nor did she "report" it to "anybody." According to the records, Margaret did not have cool skin or a low temperature prior to February 19, 2018.

Meadowview nursing assistant Charlotte Blake testified, but only "[v]aguely" recalled Margaret and did not have independent recollection of

caring for her. However, Blake did not recall a cold room or maintenance fixing the heat in the room. Similarly, Meadowview nursing assistant Susan Cowan testified, but did not have any independent recollection about caring for Margaret on the day of the incident.

Meadowview nurse Joan Foltz, the manager of Margaret's floor, testified next. Foltz was responsible for "making sure the unit was safe, happy, [and] secure for the residents" and reporting any environmental issues to maintenance. As part of her duties, Foltz would "make rounds," checking each room for safety hazards or issues, including room temperature. Foltz had never called maintenance "because of a room temperature issue in [a] patient's room" during her tenure as unit manager on Margaret's floor.

Foltz recalled Margaret as a "total care" patient with dementia who, in Foltz's opinion, was unable to communicate. On the day of the incident, Foltz recalled Potts calling her to Margaret's room and telling Foltz "[Margaret] really wasn't eating that day." Foltz instructed Potts to "get a set of vitals on [Margaret] and call the doctor."[11] At that time, Foltz had made an "assessment" to ensure the room was "safe" but did not check the thermostat as the "room was

---

[11] Foltz testified Potts had not told her she had taken Margaret's temperature earlier in the day.

comfortable."

Foltz documented the incident the next day in a "late note."[12]  The note read:

> Observed resident in bed, eyes open to verbal stimuli, non-verbal which is not unusual for resident, skin tone pink color, cool to touch, respirations even, non-labored, instruct nurse staff to obtain vital signs to make MD aware of findings, notified by nurse MD verbal order to send to hospital.

On cross-examination, Foltz admitted a temperature of ninety-six degrees Fahrenheit would never be considered a "normal body temperature."  Foltz also testified Potts would not have been allowed to use her own thermometer from home because it would not have been calibrated for accuracy by Meadowview.  According to Foltz, Meadowview provided ear thermometers to staff.  Foltz also admitted nobody told her Margaret's medication was being withheld because of lethargy and she would expect such information to be documented.

Christopher Palermo, division director of Atlantic County's Facilities Management, was responsible for maintaining the centralized work order system Meadowview used for maintenance issues.  The work order system reflected any

---

[12]  Foltz described her note as "late" because it was not written the same day as the incident.

"HVAC or [] heating or air conditioning problem[s]" reported by Meadowview. An emergency situation, however, was typically called in by "phone," rather than presented through a work order, and Palermo admitted an emergency call would not necessarily be documented the same way.

According to Palermo, a work order dated February 7, 2018, documented a Meadowview room "having a heating and ventilation problem," and indicated "the room [was] cold and the heat [was] turned all the way up." The order was marked as "completed" on February 23, 2018, but Palermo admitted that did not indicate "when the work was done." Palermo did not know the cause of the issue or how it was fixed, but the issue affected room 158, while Margaret's room was 65A.

Stacy Bates, the director of nursing at Meadowview, had been one of Margaret's caretakers during the time of the incident. Although she did not recall the incident beyond "sen[ding Margaret] to the hospital," Bates testified if there was an "environmental issue," such as a lack of "appropriate temperature," she expected the staff to either report it to her or to maintenance. Bates also expected the nurses to tell her "if they withheld medication from a resident over a several day period," but could not recall if she was notified of Margaret's lethargy or the withholding of her Klonopin.

19

Bates did not recall any issues with heat on Margaret's floor in February of 2018, nor could she recall the heating issue with room 158. She testified she permitted the nurses to use "their own personal thermometers to measure their patient[s'] internal body temperature[s]," and confirmed the "normal body temperature of a resident at Meadowview" was "[n]inety-six to ninety-nine" degrees Fahrenheit.

Dr. Alexander Makris, defendant's expert in internal and nursing home medicine, presented a contrary theory of how Margaret became hypothermic. Makris opined that Margaret's hypothermia resulted from "thermal deregulation" caused by "entering into the end stages of her life." Makris explained as individuals grow older, they lose the ability to shiver, intake less fluids, and become susceptible to cognitive issues, all which can impact the body's ability to regulate temperature.

Makris testified that in general, "hypothermia in nursing home individuals[] is multi-factorial," and depends on "the patient," "the treatment," and "the clinical condition." Makris found it significant that Margaret's "overall condition was declining," which "supported" his opinion that "[Margaret's] thermodysregulation was multi-factorial."

Makris did not find it "terribly unusual" that Margaret "never became

20

hypothermic again" after the hospital visit, as incidents of hypothermia "can be sporadic." He also noted "[t]here [were] numerous temperatures within the record that show that [Margaret's] temperature was less than ninety-seven or ninety-eight degrees [Fahrenheit]." Makris did not identify any "severe environmental factors . . . that could cause [Margaret] to develop hypothermia."

Makris rejected the contention that Margaret suffered an injury after the hypothermic episode, opining that Margaret's hypothermia did not "result[] in any permanent neurological sequelae," and once she recovered, "she was back to her baseline." However, he admitted "because [of] her dementia . . . it would be difficult to ascertain if she was back to her baseline." Makris also disagreed that the Meadowview nurses did not meet the standard of care, as Potts contacted the physician the fourth day Margaret did not receive her Klonopin.

On cross-examination, Makris admitted hypothermia is "not a very common thing to happen even to someone who's [eighty-seven] years old with co-morbidities." Although he opined Margaret had "end-stage dementia prior to becoming hypothermic," he acknowledged neither Meadowview nor Shore Medical had any "written records" diagnosing Margaret with "end-stage dementia," nor did he see in the records anything "advising the Santo family to start making end-of-life decisions."

Michelle Knudsen, nursing home administrator at Meadowview during the time of the incident, testified she was responsible for "everything that happen[ed]" at Meadowview and was "familiar" with the HVAC system at Meadowview. She explained the "chiller," or the part of the HVAC system that creates cold air, was shut off entirely during the winter months. She also testified she had access to software that allowed her to monitor "what the temperature [was] . . . [i]n the common areas of the building," and notified her of any "alarms" indicating issues with the HVAC system.

Knudsen was not working the two days prior to the incident nor the day of the incident and found out what had happened with Margaret the morning after the incident. After being briefed, Knudsen investigated surveillance footage that pointed to the windows outside Margaret's room and the HVAC monitoring program. Her investigation revealed no open windows in Margaret's room nor any alarms or "abnormal[ities]" with the HVAC system.

On cross-examination, Knudsen acknowledged the HVAC monitoring system did not monitor the temperature in individual rooms, as "there [were] no . . . thermometers in each room." Knudsen did not know what was done to fix the heating issue in room 158, nor did she have independent knowledge of the temperature in Margaret's room on the date of the incident.

A-3009-23

Knudsen testified that employees were not required to document "every aspect," of patient care, but were required to document "[c]are plans, interdisciplinary notes, advanced directives, assessments that are done by each discipline, MDSes,[13] [and] . . . medical [administration] record[s]." She explained Margaret's care plan was not updated even though her "cognition was declining" because Meadowview "w[as] still able to meet her needs." She also acknowledged as of December 2017, "there was a prognosis that [Margaret] was not terminal" in Margaret's Medicaid documentation.

After Knudsen testified, defendants rested their case. The jury returned a unanimous verdict the next day, finding defendants violated Margaret's rights as a nursing home resident pursuant to N.J.S.A. 30:13-5(j) and awarded $450,000 in damages. The judge entered a conforming judgment on March 26, 2024.

After the trial, defendants moved for JNOV pursuant to Rule 4:40-2, or, in the alternative, a new trial pursuant to Rule 4:49-1. Defendants argued they were entitled to JNOV because the evidence presented at trial only supported an inference that Margaret's room was between sixty and seventy degrees Fahrenheit, which was not cold enough to cause hypothermia. In the alternative,

---

[13] An "MDS," or "minimum data set," is a required document that reports a nursing home resident's status.

defendants argued a new trial was warranted because Damore's lay opinion testimony was improperly admitted and the verdict was against the weight of the evidence. Defendants also challenged the award of damages as against the weight of the evidence because there was no guidance on how to quantify violations of the Act and the award shocked the conscience.

The judge denied the motion in an order entered May 10, 2024. In an accompanying memorandum of decision, the judge recounted the facts and procedural history of the case, applied the governing legal principles, and concluded there was sufficient evidence to support the verdict and the damage award. This appeal followed.

On appeal, defendants reprise the arguments rejected by the judge. Defendants argue the judge erred in denying their motion for JNOV as there was "insufficient evidence to support a verdict that . . . defendants violated N.J.S.A. 30:13-5(j)." Defendants assert no rational juror could conclude the room was cold enough to cause hypothermia because Damore could not say the room was colder than sixty degrees Fahrenheit and no other testimony established the room was cold enough for Margaret to have suffered hypothermia. In addition, defendants contend there was insufficient evidence to support a violation of N.J.S.A. 30:13-5(j) on any other theory of liability, such as defendants' alleged

24

(1) failure to timely notify Margaret's physician when they withheld her Klonopin, (2) failure to timely intervene upon discovering Margaret's condition,[14] and (3) use of a personal rather than facility provided thermometer to measure Margaret's temperature.

Defendants further assert the judge erred in denying their motion for a new trial as Damore's improper lay opinion testimony prejudiced the outcome, there was "no evidence from which a jury could reasonably conclude that the room was cold enough for [Margaret] to become hypothermic," and the damage award "was against the weight of the evidence" and should have been guided by "common law tort principles." As to the latter point, defendants state damages in tort law are designed to provide "compensation for the injury caused to [the] plaintiff by defendant's breach of duty," and because under the New Jersey Survivor's Act, N.J.S.A. 2A:15-3, "pain and suffering damages" can only be granted "if the decedent experienced conscious pain and suffering between the time of the injury and his or her death," the damages in the instant case must only compensate Margaret's family for her "conscious pain and suffering and loss of enjoyment of life." As there was no testimony regarding whether

---

[14] Although the judge refers to this theory of liability as the failure to promptly warm Margaret, it appears the underlying theory of liability refers to Meadowview's alleged delay in contacting emergency medical services.

A-3009-23

Margaret suffered pain in the two weeks she was placed in hospice care after the hypothermic episode, defendants posit the jury verdict of $450,000 "was plainly wrong and shocks the conscience."

II.

Our review is governed by well-established principles. In reviewing a motion for JNOV pursuant to Rule 4:40-2(b), we have the same task as a trial court. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997).

> [T]he test is . . . whether the evidence, together with the legitimate inferences therefrom, could sustain a judgment in . . . favor of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.
>
> [Ibid. (alteration and omissions in original) (quoting Dolson v. Anastasia, 55 N.J. 2, 5 (1969)) (internal quotation marks omitted).]

To ensure we do not overstep our bounds "by usurping the jury's task of assessing the credibility of the witnesses," a "jury's factual determination will be disturbed only if we find that the jury could not have reasonably used the evidence to reach its verdict." Ibid.

Like the trial court, we "are not concerned with 'the worth, nature or extent

26

(beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.'" Koseoglu v. Wry, 431 N.J. Super. 140, 155 (App. Div. 2013) (quoting Sons of Thunder, Inc., 148 N.J. at 415). Thus, "[w]e will not disturb the trial judge's determination if 'the evidence, together with the legitimate inferences therefrom, could sustain a judgment in the [non-movant]'s favor.'" Ibid. (second alteration in original) (quoting Sons of Thunder, Inc., 148 N.J. at 415).

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge—whether there was a miscarriage of justice under the law." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011); accord R. 2:10-1 ("The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law."). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko, 206 N.J. at 521-22).

"On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of

A-3009-23

upholding the verdict." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). As such, "[a] jury verdict is entitled to considerable deference," Risko, 206 N.J. at 521, and "should be set aside in favor of new trials only with great reluctance, and only in cases of clear injustice." Boryszewski, 380 N.J. Super. at 391. To that end, "a trial court's obligation on a motion for a new trial" is "to correct clear error or mistake by the jury." Kita v. Borough of Lindenwold, 305 N.J. Super. 43, 49 (App. Div. 1997) (quoting Dolson, 55 N.J. at 6). "The court is to take into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, and the intangible 'feel of the case' which it has gained by presiding over the trial." Ibid. (quoting Dolson, 55 N.J. at 6).

When a motion for a new trial is based on weight of the evidence grounds, "[t]he standard for reversal . . . is high." Klawitter v. City of Trenton, 395 N.J. Super. 302, 325 (App. Div. 2007). A verdict may only be disturbed if, "upon examination[,] the verdict is found to be so contrary to the weight of the evidence as to give rise to the inescapable conclusion that it is the result of mistake, passion, prejudice or partiality." Ibid. (quoting Aiello v. Myzie, 88 N.J. Super. 187, 194 (App. Div. 1965)). Thus, a jury verdict "should not be overthrown except upon the basis of a carefully reasoned and factually

supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." Risko, 206 N.J. at 521 (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977)).

When a motion for a new trial is based on the quantum of damages, "[a] trial court should not disturb the amount of a verdict unless it constitutes a manifest injustice that shocks the judicial conscience." Carey v. Lovett, 132 N.J. 44, 66 (1993). "An award that shocks the judicial conscience is one that is 'wide of the mark,' 'pervaded by a sense of wrongness,' and 'manifestly unjust to sustain.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 503 (2016) (internal citation omitted) (quoting Johnson v. Scaccetti, 192 N.J. 256, 281 (2007), overruled in part by Cuevas, 226 N.J. 480). However, "[t]he appellate role [in reviewing the amount of a verdict] is . . . restricted," as "an appellate court should show appropriate deference to the trial court's 'feel of the case.'" Carey, 132 N.J. at 66 (quoting Baxter, 74 N.J. at 600).

Turning to the cause of action at issue, plaintiff alleged defendants violated the NHA, specifically N.J.S.A. 30:13-5(j). The NHA was enacted "to declare 'a bill of rights' for nursing home residents," rights set forth in N.J.S.A. 30:13-5(a) to (n), and "define[s] the 'responsibilities' of nursing homes," as

delineated in N.J.S.A. 30:13-3(a) to (j). <u>Ptaszynski v. Atl. Health Sys.</u>, 440 N.J. Super. 24, 32-33 (App. Div. 2015). Subsection (j) of N.J.S.A. 30:13-5 states:

> Every resident of a nursing home shall: . . . . [h]ave the right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the right to expect and receive appropriate assessment, management[,] and treatment of pain as an integral component of that person's care consistent with sound nursing and medical practices.

N.J.S.A. 30:13-8(a) provides that "[a]ny person or resident whose rights" as defined in the NHA "are violated shall have a cause of action against any person committing such violation." A "[r]esident" is defined as "any individual receiving extended medical or nursing treatment or care at a nursing home." N.J.S.A. 30:13-2(e). A plaintiff can "recover actual and punitive damages[15] for the[] violation." N.J.S.A. 30:13-8(a). If the jury finds the defendant violated any of the rights under the Act by a preponderance of the evidence, the jury "must find for [p]laintiff on th[e] issue." <u>Model Jury Charges (Civil)</u>, 5.77, "Violations of Nursing Home Statutes or Regulations – Negligence and Violations of Nursing Home Residents' Rights Claims" (rev. Nov. 2023).

---

[15] Punitive damages were not sought due to a pretrial ruling by the judge which was not challenged.

Applying these principles, we are satisfied plaintiff presented sufficient evidence to support the jury verdict on the primary theory of liability, namely, that defendants improperly allowed Margaret's room to become cold enough that she developed hypothermia and declined shortly thereafter. Plaintiff provided evidence of a standard of care associated with the right enumerated in N.J.S.A. 30:13-5(j), a breach, an injury, and a causal relationship between the injury and the breach.

Critically, Starer's and Tache's testimony established Meadowview was responsible for preventing the room from becoming cold enough to adversely impact a resident's health. In responding to the emergency call, Damore described Margaret's room as an "icebox" and considered the room's temperature significant enough to Margaret's treatment to inform Shore Medical upon transfer. Contrary to defendants' contention, Starer's and Tache's expert opinions were not dependent on them knowing whether the temperature in Margaret's room was below sixty degrees, as both acknowledged their opinions were not based on knowing the exact room temperature. Additionally, Starer testified Margaret must have been exposed to cold to develop hypothermia, which resulted in her decline.

A-3009-23

We reject defendants' contention that Damore's testimony could only support a finding that Margaret's room was between sixty and seventy degrees, which was insufficient to cause hypothermia. Damore's inability to say with certainty that the room was below sixty degrees did not mean the room was not cold enough to cause Margaret's hypothermia. In fact, both plaintiff's and defendants' experts suggested that individuals in Margaret's condition could be more susceptible to cold.

As noted by the judge in denying the motion, no expert testified how cold a room needed to be to cause hypothermia. The standard only concerns itself with the "existence" of evidence supporting the verdict. Koseoglu, 431 N.J. Super. at 155 (quoting Sons of Thunder, Inc., 148 N.J. at 415). Because there was sufficient evidence to support a verdict based on the theory that defendants improperly exposed Margaret to a cold room, we need not address the other theories of liability. Est. of Roach v. TRW, Inc., 164 N.J. 598, 614 (2000) ("[I]f there are numerous theories upon which the jury could have rested its determination, the verdict of the jury must be upheld if there is any one possible theory of liability . . . substantiated by the evidence taken as a whole. . . ." (quoting Sons of Thunder, Inc. v. Borden, Inc., 285 N.J. Super. 27,

A-3009-23

77 (App. Div. 1995) (Humphreys, J.A.D., dissenting) (citation and internal quotation marks omitted), rev'd, 148 N.J. 396 (1997))).

We also reject defendant's assertion the judge erred in allowing Damore to describe Margaret's room as an "icebox."

Under N.J.R.E. 701,

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

The first prong of N.J.R.E. 701 requires a witness to "have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." Est. of Nicolas v. Ocean Plaza Condo. Ass'n, 388 N.J. Super. 571, 582 (2006) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)); see Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 701 (2026) ("[I]t is merely required that the witness have actual knowledge, acquired through the use of his [or her] senses, of the matter testified to.").

As to the second prong of N.J.R.E. 701, in State v. Sanchez, 247 N.J. 450 (2021), our Supreme Court explained:

N.J.R.E. 701's second prong requires that lay opinion testimony will assist the jury "in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701(b). Such testimony must "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." State v. Singh, 245 N.J. 1, 15 (2021) (quoting State v. McLean, 205 N.J. 438, 458 (2011)). A witness may not offer lay opinion on a matter "as to which the jury is as competent as [the witness] to form a conclusion." McLean, 205 N.J. at 459 (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

[Sanchez, 247 N.J. at 469-70 (second alteration in original) (citations reformatted).]

See Gonzales v. Hugelmeyer, 441 N.J. Super. 451, 460-61 (App. Div. 2015) (extending N.J.R.E. 701 principles restricting certain lay opinion testimony in criminal cases to civil cases).

"In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). An abuse of discretion occurs "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)).

Here, the judge explained her reasoning for permitting Damore's testimony as follows:

> Damore's use of the word icebox to describe [Margaret's] room was first-hand, personally perceived by the witness and reflective of the way the temperature of the room was perceived by this witness. Further, the temperature of [Margaret's] room and whether it contributed to her hypothermia was a fact in issue in this case. [Damore's] first-hand, direct testimony of his immediately perceived feeling of the temperature of [Margaret's] room was admissible to help the jury with their fact findings.

We agree with the judge's ruling and reasoning and discern no abuse of discretion.[16] The judge properly applied N.J.R.E. 701's precepts and correctly concluded Damore's lay opinion was based on his perception, acquired through his personal senses, and his testimony would assist the jury in resolving a disputed issue, namely, the temperature of Margaret's room. As noted by the judge, "[d]efendants had ample opportunity to cross-examine [Damore] with regard to his impressions, including his use of the word 'icebox.'" As such, there was no error.

---

[16] The judge also denied defendants' in limine motion to bar Damore's testimony, a decision with which we also concur.

35

Nor can the quantum of damages warrant a new trial. The judge gave the jury the following instruction on damages:

> [P]laintiff has the burden of establishing by a preponderance of the credible evidence each item of damages that he claims. . . . [P]laintiff[] must also prove that the damages were the natural and probable consequences of the incident. Damages may not be based on conjecture or speculation. In this case, . . . plaintiff is seeking damages for violations of the [NHA]. In the event that you find in plaintiff's favor as to a violation of the [NHA], you may award damages that would fairly and reasonably compensate plaintiff . . . for plaintiff's damages resulting from the violation of [Margaret's] nursing home rights.[17]

Significantly, as the judge noted, defendants did not request a specific damage charge despite repeated opportunities to do so. Further, defendants consented to the charge given and made no objection to the omission of specific damage criteria to guide the jury's decision. Therefore, defendants cannot now argue error. See N.J. Div. of Youth and Fam. Servs. v. M.C. III, 201 N.J. 328, 341 (2010) ("Trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." (quoting State v. Corsaro, 107 N.J. 339, 345 (1987))).

---

[17] During deliberations, the jury asked the judge for "guidance on defining damages" and inquired whether there was "a criteria used for a monetary award." With counsel's consent, the judge repeated the original instruction given on damages.

Nevertheless, the judge detailed the facts she believed justified the damage award, including the change in Margaret's condition before and after the hypothermic episode. The judge pointed to Margaret's inability to make sounds and respond to William in the same way as prior to the incident, as well as the fact that she required a feeding tube. The testimony clearly established the hypothermic incident resulted in Margaret's rapid decline, causing her death. Considering the deference afforded the trial court's "feel" of the case, there are no facts suggesting the verdict "shocks the judicial conscience," and, as such, the judge did not err in denying defendant's motion. Carey, 132 N.J. at 66.

To the extent we have not specifically addressed a particular argument, we deem it without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

37

A-3009-23